UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, f/k/a General Motors Corp., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>Jointly Administered |
| KELLY CASTILLO, NICHOLE BROWN, BRENDA ALEXIS, DIGIAN DOMENICO, VALERIE EVANS, BARBARA ALLEN, STANLEY OZAROWSKI, AND DONNA SANTI,<br><br>Plaintiffs,<br>v.<br><br>GENERAL MOTORS COMPANY, f/k/a New General Motors Company, Inc.,<br><br>Defendant. | Adversary Proceeding<br><br>Case No. 09-00509 (REG) |
| GENERAL MOTORS LLC,<br><br>Counterclaimant,<br><br>v.<br><br>KELLY CASTILLO, NICHOLE BROWN, BRENDA ALEXIS, DIGIAN DOMENICO, VALERIE EVANS, BARBARA ALLEN, STANLEY OZAROWSKI, DONNA SANTI, LAKINCHAPMAN LLC, ROBERT W. SCHMIEDER, II, AND MARK L. BROWN,<br><br>Counterdefendants. | |

DECISION AFTER TRIAL

APPEARANCES:

SL CHAPMAN LLC
*Counsel for the Plaintiffs*
330 North Fourth Street, Suite 330
St. Louis, Missouri 63102
By: Robert W. Schmieder II, Esq. (argued)
Mark L. Brown, Esq.

LEADER & BERKON
*Counsel for the Plaintiffs*
630 Third Avenue
New York, New York 10017
By: S. Alyssa Young, Esq.

KING & SPALDING LLP
*Counsel for New GM*
1155 Avenue of the Americas
New York, New York 10036
By: Arthur Steinberg, Esq. (argued)
Scott Davidson, Esq.

ISAACS CLOUSE CROSE & OXFORD LLP
*Counsel for New GM*
21515 Hawthorne Boulevard, Suite 950
Torrance, California 90503
By: Gregory R. Oxford, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 11 case of reorganized debtor Motors Liquidation Company (formerly known as General Motors, and referred to here as "**Old GM**"), plaintiffs Kelly Castillo and others (the "**Castillo Plaintiffs**") seek a declaratory judgment that in July 2009, General Motors LLC ("**New GM**"), the purchaser of Old GM's assets in Old GM's 363 sale (the "**363 Sale**"), assumed a settlement agreement between Old GM and the Castillo Plaintiffs as part of New GM's purchase. The settlement agreement required Old GM (and, the Castillo Plaintiffs argue, New GM) to pay for transmission repair or replacement for class members, and the Castillo Plaintiffs' attorneys' fees.

After trial, the Court determines that New GM did not assume that settlement agreement as part of the 363 Sale.

The Court's Findings of Fact and Conclusions of Law in connection with this determination follow.

## Findings of Fact[1]

### *1. The Castillo Class Action*

The Castillo Plaintiffs are members of a class certified in an earlier district court plenary action ("***Castillo***"), before Judge William Shubb, U.S.D.J., in the Eastern District of California. In October 2007, the Castillo Plaintiffs brought suit on behalf of themselves and others who owned model year 2002-2005 Saturn Vues and model year 2003-2004 Saturn Ions (the "**Saturns**"). The Saturns were sold with an express written warranty that provided for correction of "any vehicle defect related to materials or workmanship within the warranty period" at no cost to the owner.

[1] To shorten this Decision, the Court limits its citations to the most significant matters.

The express warranty for the Saturns originally provided coverage for three years or 36,000 miles, whichever occurred first. Through bulletins sent to dealerships and customers, (with each referred to as a "**Special Policy**"), Old GM extended the coverage period to five years or 75,000 miles for Saturns for model years 2002 to 2004, and thereafter for model year 2005, in March 2004 and January 2005, respectively.[2]

The Castillo Plaintiffs alleged that each had experienced a VTi transmission failure after his or her vehicle was no longer eligible for coverage under the express warranty, and that Old GM "breached [the] express warranties by selling to [the Castillo Plaintiffs] vehicles equipped with defective VTi transmissions."[3] They also alleged that "[a]ny limitation on the duration of GM's express warranties [was] unconscionable" because Old GM "was actually or constructively aware" of the defect at the time of the sale of the Saturns.[4]

Finally, with respect to the express warranty, the Castillo Plaintiffs asserted that "[a]ny attempt by [Old] GM to repair a defective Vti transmission or to replace one defectively designed Vti transmission with another defectively designed Vti transmission within the warranty period could not satisfy GM's obligation to correct defects under the warranty."[5]

Along with their express warranty claim, the Castillo Plaintiffs brought three additional claims: statutory consumer fraud, breach of the implied warranty of merchantability, and unjust enrichment.[6]

---

[2] Joint Exhs. V and PP. Special Policy 04020 extended the warranty for model years 2002 to 2004, while Special Policy 04020A applied to model year 2005.

[3] Joint Exh. F ¶ 87. For simplicity, when citing to the class action complaint, the Court cites only to the last version, the Second Amended Complaint.

[4] *Id.* ¶ 89.

[5] *Id.* ¶ 90.

[6] *Id.* at 17, 20, and 24, respectively.

Old GM moved to dismiss the class action, but before the dismissal motion was decided, the parties entered mediation and settled the dispute. The settlement took the form of a stipulation (the "**Settlement Agreement**"), in which the parties described their respective positions:

> [The Castillo Plaintiffs] claim that [Old] GM is liable to alleged class members for damages under state consumer protection statutes and on breach of warranty and unjust enrichment theories. GM denies that there is any defect or that it is liable to plaintiffs or members of the proposed Class on any theory.[7]

Relief for the Castillo Plaintiffs included reimbursement for expenses associated with replacing their transmissions, up to 125,000 miles, and towing and rental costs. Old GM also agreed to pay the Castillo Plaintiffs' attorneys' fees and expenses, of no greater than $4.425 million.

The Settlement Agreement was executed in July 2008. Judge Shubb preliminarily approved the settlement in September 2008, and notice was given to potential class members in January 2009.

On February 3, 2009, even though the Settlement Agreement was not yet approved by the district court, Old GM issued an administrative message to its authorized dealers with instructions to repair VTi transmissions and reimburse their owners in accordance with the terms of the Settlement Agreement. The administrative message noted that the "settlement ha[d] not been finally approved by the court," but that Old GM "believe[d] this [would] enhance customer satisfaction without the delay in waiting for ultimate final settlement approval."[8]

---

7 Joint Exh. B at 2, ¶ 2.

8 Joint Exh. MM.

Judge Shubb granted final approval of the Settlement Agreement and entered a judgment on the settlement (the "**Class Judgment**") on April 14, 2009. The appeal period expired on May 18, 2009, and the Class Judgment would become effective ten business days thereafter.

But before the Class Judgment became effective, Old GM filed its chapter 11 case.[9] At the time of its chapter 11 filing, Old GM was paying VTi transmission claims according to the terms of the Settlement Agreement and the "goodwill policy" put in place on February 3, 2009.

*2. Pre-Filing Discussions and Negotiations*

As described in more detail in other rulings in Old GM's chapter 11 case,[10] Old GM moved, at the very outset of its chapter 11 case, to sell the bulk of its assets, under section 363 of the Code (the "**363 Sale**"), to a newly created entity that thereafter became New GM. Old GM and the U.S. Treasury ("**Treasury**"), acting through its Auto Task Force (the "**Auto Task Force**"),[11] began discussing plans for the 363 Sale well before Old GM's chapter 11 case was filed.

After the 363 Sale, New GM would have to assume at least some of Old GM's liabilities, since taking them on would be important to New GM's ability, going forward, to manufacture and sell vehicles. But if the restructuring were to succeed, and New GM were to be viable, New GM would need to take on only those liabilities that were important to its ability to continue the

---

9 Though the Court would be inclined to view the not-yet-consummated Settlement Agreement as an executory contract at the time of Old GM's chapter 11 filing, with material unperformed obligations on each side (and the Court heard evidence suggesting that Old GM thought likewise, identifying it as an obligation to "reject later," see page 27, *infra*), the Court doesn't need to determine the Settlement Agreement's executory character now. The issue here isn't determination of any claims the Castillo Plaintiffs might have against Old GM; it is, rather, the extent to which New GM agreed to undertake Old GM's obligations.

10 *See, e.g.*, *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (the "*363 Sale Decision* "), *stay pending appeal denied*, 2009 WL 2033079 (S.D.N.Y. 2009) (Kaplan, J.), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed*, No. 10–4882–bk (2d Cir. Jul. 28, 2011).

11 At least much of Treasury's participation was through its Auto Task Force. In this Decision, the Court generally refers to the more descriptive "Auto Task Force," but sometimes refers to "Treasury" when it refers to the expression that a witness or a party used at the time.

business. This species of a balancing act was expressly addressed in discussions between the Treasury/Auto Task Force personnel and Old GM personnel before the sale.

Lawrence Buonomo ("**Buonomo**"), an attorney for Old GM who was involved in the restructuring process,[12] explained that there was "conceptual agreement"[13] about which liabilities were to be assumed by New GM and which liabilities were to be retained by Old GM. In deposition testimony the Court accepts as true, Buonomo testified:

> Q. Just so I understand your answer, prior to June 1st, there was very little of what you would call negotiating regarding retain[ed] versus assumed liabilities. There was instead conceptual agreement at that point. And then after the bankruptcy filing on June 1st, there was additional discussion regarding which liabilities would be assumed and which would be retained?
>
> A. I think that's fair.
>
> Q. So let's talk first about the time period prior to June 1st, 2009. When you say there had been conceptual agreement about assumed versus retained liabilities, please explain what you mean by that.
>
> A. Well, the intent and structure of the transaction that was outlined to us by the [T]reasury team was that all liabilities would be left behind except a few individual items which included the express[] warranties and included contracts necessary to the operation of the business. . . . I may be missing something, *but the fundamental rule was in essence it all got left behind.* And of course we all do this, but left behind in this context *means not assumed by the new company pursuant to the transaction*.[14]

Based on that and the other evidence discussed below, the Court finds that it was the intent and structure of the 363 Sale, as agreed on by the Auto Task Force and Old GM, that New GM

---

12 Of the two Old GM attorneys involved in this matter (Buonomo and H. Joseph Lines, III ("**Lines**")), Buonomo had a greater amount of responsibility for the restructuring. *See* Buonomo Dep. at 11. Lines was principally responsible for managing the Castillo Plaintiffs' litigation, *see* Lines Dep. at 9, though Buonomo had some knowledge about the litigation.

13 Buonomo Dep. at 27.

14 *Id.* at 27-28 (transcription error corrected; emphasis added).

would start business with as few legacy liabilities as possible, and that presumptively, liabilities would be left behind and not assumed.

As specifically applicable to this controversy, in one of the discussions between the Auto Task Force and Old GM, on May 14, 2009 (about two weeks before Old GM's chapter 11 filing), *Castillo* obligations were expressly mentioned as one of three examples of litigation liabilities that would remain with Old GM. That was discussed in a multi-participant conference call between lawyers for Old GM and lawyers for Treasury, at least many of whom were from Cadwalader, Wickersham & Taft ("**Cadwalader**"), which was assisting Treasury's Auto Task Force.

In deposition testimony the Court finds to be significant and once again accepts as true, Buonomo discussed that conference call, which covered, at the least, litigation then pending against Old GM. In that call, Buonomo expressly mentioned the *Castillo* litigation. As he testified:

> I did in that conversation reference that there were several class actions in the midst of settlement *that would in effect be left behind*, to use the colloquial term. And by happenstance, Castillo to the best of my recollection was one of the three examples I came up with as I was speaking . . . .[15]

> [A]s of May 14th, the shared intent was that all litigation liabilities would be left behind. All litigation liabilities of the sellers—that is to say General Motors Corporation, Saturn, and the dealership that was the third debtor—would be left behind.[16]

Thus obligations arising from the *Castillo* litigation were expressly understood, by each of Old GM and the Auto Task Force, to be remaining with Old GM.

---

15 *Id.* at 44-45 (emphasis added).

16 *Id.* at 53-54.

Buonomo also recalled an additional conference call with Cadwalader and Auto Task Force personnel, on a day between May 1 and June 1, 2009 (but other than May 14, 2009), that was focused on executory contracts. Its purpose was to identify executory contracts that should be rejected.[17] "Reference was made to settlements as a class of executory contracts that would be rejected," though *Castillo* was not mentioned by name.[18]

This testimony, particularly in the aggregate, strongly evidences contemporaneous thinking at the time, *expressly discussed*, that liabilities under the Settlement Agreement here would *not* be assumed.

*3. Post-Filing, Pre-363 Sale*

Once the bankruptcy petition and sale motion had been filed, Old GM and Treasury continued to negotiate detailed aspects of the proposed sale. But there is no evidence that the purpose changed, and, in fact, the evidence weighs heavily to the contrary.

*(a) Opening Remarks in Court*

The goal of the 363 Sale noted above—with New GM assuming as few liabilities as necessary—was expressly stated in open court on the first day of GM's chapter 11 case, on June 1, 2009. In his opening remarks, GM attorney Harvey Miller noted the goal of Old GM's chapter 11 case: to create "a new General Motors, not overburdened by debt and other costs that made [Old GM] essentially noncompetitive."[19]

*(b) Auto Task Force Testimony*

Then, about four weeks later, during the evidentiary hearing on the 363 Sale, the same point was made repeatedly, and more explicitly. Auto Task Force member Harry Wilson

---

17 *Id.* at 52.

18 *Id.* at 52-53.

19 Tr. of Hrg. on Jun. 1, 2009 at 36 (Case #09-50026 ("**Main Case**") ECF #374).

("**Wilson**"), under cross-examination by objectors to the 363 Sale, testified that "[o]ur thinking [as] a commercial buyer of the assets that will constitute [New GM] was to assess what *[l]iabilities were commercially necessary* for the success of [New GM]."[20] He later said "we're focused on *which assets and which liabilities we needed for the success of New GM*."[21] And again: "We focused on which assets we wanted to buy and *which liabilities were necessary for the commercial success of New GM*."[22]

In short, by the end of the 363 Sale hearing it was clear not only to Old GM and Treasury, but also to the Court and to the public, that the goal of the 363 Sale was to pass on to Old GM's purchaser—what thereafter became New GM—only those liabilities that were commercially necessary to the success of New GM.

*(c) Failure to List as Contract to be Assumed and Assigned*

In the period after Old GM's filing but before the 363 Sale, Old GM also requested, and the Court approved, an order establishing sale and bidding procedures (the "**Sale Procedures Order**") incident to the proposed upcoming sale.[23] The Sale Procedures Order, among other things, set up a system by which Old GM could designate contracts to be assigned to New GM.

Old GM proposed "Assumption and Assignment Procedures" under which Old GM could designate an Old GM contract to be an "Assumable Executory Contract" to be assigned to New GM.[24] All Assumable Executory Contracts were placed on a schedule to the 363 sale agreement

---

[20] Tr. of Hrg. on Jul. 1, 2009 at 104 (transcription errors corrected; emphasis added).

[21] *Id.* at 106 (emphasis added).

[22] *Id.* at 111 (emphasis added).

[23] Main Case ECF #274.

[24] Main Case ECF #274 at 9-11.

(the "**Sale Agreement**"),[25] which was made available on a website that provided information to the contracts' counterparties.

The Settlement Agreement was never listed as an Assumable Executory Contract.[26] To the contrary, on May 30, 2009, the Settlement Agreement was identified by Old GM as a contract to "reject later."[27]

*(d) Dialogue with Objectors*

Also relevant are discussions between Old GM and Treasury arising from objections by various state attorneys general ("**AGs**") who participated actively in the proceedings before the 363 Sale, as relevant here to protect consumers' rights. The AGs urged in argument before the Court that New GM take on liabilities broader than those that would be undertaken under the Sale Agreement as initially proposed—including implied warranties, additional express warranties, statutory warranties, and obligations under Lemon Laws.[28]

The AGs' concerns were significant enough to warrant discussion by Buonomo, Wilson, and others on a conference call in the days leading up to the 363 Sale hearing. As Buonomo recounted, "there was some discussion" that New GM "should take on implied warranties."[29] But Buonomo noted that taking on implied warranties would (or at least could) mean taking

---

25 The Sale Agreement was more formally entitled "Amended and Restated Master Purchase and Sale Agreement," and referred to more than occasionally as the "ARMSPA." By reason of the Court's dislike of acronyms, which rarely are helpful to anyone lacking intimate familiarity with the subject, the Court simply says "Sale Agreement."

26 It is not clear from the Sale Procedures Order whether a contract necessarily had to be included in that particular schedule to be assumed and assigned to New GM. Though the schedule seems to have been created for exactly that purpose, it is perhaps conceivable that a contract could be assigned to New GM in some other way. But there is no evidence that the Settlement Agreement was assigned to New GM by *any* mechanism, by the schedule or any other.

27 New GM Exh. 4.

28 *See*, *e.g.*, Main Case ECF #2043, at 37-38 (objection by AGs from 37 states).

29 Buonomo Dep. at 76.

along the entire class action docket, including the *Castillo* Settlement Agreement, and Wilson agreed that such a course would not be a good idea for New GM:

> Q: What broadening of the scope of warranty liability were the [AGs] requesting?
>
> A.: I think they would have liked us to assume all consumer-related liabilities of General Motors Corporation.
>
> Q: Meaning including [*sic*] implied warranties?
>
> A: Everything, everything, everything. And implied warranties were very high on their list actually. And there was some discussion, someone said, well, maybe we should do that. Maybe we should take on implied warranties. The person was assuming that was essentially in the nature of I'll call retail consumer relations-type stuff. . . . I commented . . . [w]ell, you could do that, but understand that if you do that, you will essentially take the entire class action docket with you, because essentially all a class action is, generally speaking, is a whole bunch . . . of implied warranty and other claims of that sort bundled together in a class.
>
> And Mr. Wilson, who was the primary spokesman for the [T]reasury on this call, said . . . I agree with Larry [Buonomo], correctly discerning that I thought it was a bad idea. And that was pretty much the end of that idea.[30]

Once again, then, the idea of New GM's assuming obligations arising from earlier class actions was expressly considered and rejected, by those on each side of the then-pending deal.

*4. Language of the Sale Agreement and Sale Order*

Of course, the language of both the Sale Agreement and the accompanying order (the "**Sale Order**") is of central importance to this dispute.

---

[30] *Id.* at 76-77 (transcription errors corrected).

*(a) The Sale Agreement*

Three provisions of the Sale Agreement relate to this controversy: (1) section 2.3(a)(vii)(A) (defining "Assumed Liabilities"); (2) section 2.3(b)(xvi) (defining "Retained Liabilities"); and (3) section 6.15(b) (addressing warranty claims).

*(1) Assumed Liabilities*

Under the Sale Agreement, New GM would take on "Assumed Liabilities" as part of the sale. Section 2.3(a)(vii)(A) defined Assumed Liabilities:

> all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used, or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmission) manufactured or sold by Sellers or Purchaser prior to or after the Closing . . . .

*(2) Retained Liabilities*

By contrast, "Retained Liabilities" would remain with Old GM. Section 2.3(b)(xvi) of the Sale Agreement defined Retained Liabilities, and its final subsection discussed warranties:

> all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers.

Both the Castillo Plaintiffs and Buonomo referred to this Retained Liabilities provision as the "mirror provision" to the Assumed Liabilities provision, section 2.3(a)(vii)(A).[31] The two sections were conceived of together, and according to Mr. Buonomo (in testimony the Court accepts as true), New GM "was concerned that people would be making arguments that taking

[31] Buonomo Dep. at 61; Pl. Br. at 7.

[express warranty claims] meant you had responsibility for implied warranty" claims.[32] Section 2.3(b)(xvi), therefore, was intended to clarify the outer limits of section 2.3(a)(vii)(A) by noting that only *express* warranty claims were taken on by New GM.[33]

*(3) Warranty Claims*

Then section 6.15 of the Sale Agreement addressed warranty claims. In relevant part, section 6.15(b) provided:

> From and after the Closing, Purchaser [New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment . . . manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.
>
> . . .
>
> [F]or avoidance of doubt, Purchaser shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide customer remedies in addition to or different from those specified in Sellers' express warranties.[34]

*(b) The Sale Order*

Finally, in addition to the Sale Agreement, the parties here understandably focus on the Sale Order that the Court issued allowing the sale to go forward.

---

32 Buonomo Dep. at 65.

33 This is entirely logical. New GM recognized that providing express warranties would make good business sense (and might be important to protecting its brand), but would want clarity as to exactly what it was taking on.

34 This third Sale Agreement provision, section 6.15, twice includes the "arising under" language—in addition to the "arising under" language in the Assumed Liabilities provision, section 2.3(a)(vii)(A), and the "arising out of, related to or in connection with" language in the Retained Liabilities provision, section 2.3(b)(xvi). It is apparent, from the different language that follows the "arising under" in each case (and the language that follows the similar, though broader, language with respect to Retained Liabilities), that it is the language *that follows those words in each case* that is important (rather than the lead-in words by themselves), and that the lead-in words, in the absence of more, tell the reader very little.

As is common on 363 motions, Old GM and Treasury presented a proposed order to the Court. It provided:

> The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their *express written warranties*, which were *delivered in connection with the sale of vehicles* and vehicle components prior to the Closing of the 363 Transaction *and specifically identified as a "warranty."* The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.[35]

The Court reads that as having emphasized, once again, that New GM would be assuming only express warranties that were delivered upon the sale of vehicles—and as having been intended to exclude other kinds of warranty-related claims.

*5. Post-Closing Events*

The Court issued its Decision and order approving the 363 Sale on July 5, 2009.[36] The 363 Sale closed on July 10, 2009.[37] New GM was legally formed on that date.

The Court finds that after the closing (and notwithstanding the discussions between personnel then at Old GM and Auto Task Force personnel, discussed above), there was substantial uncertainty and confusion on the part of at least some New GM personnel (at least most of whom had come over from Old GM) as to whether obligations under the Settlement Agreement had been assumed by New GM.

---

35 Sale Order, Main Case ECF #2968 at ¶ 56 (emphasis added). Though the Court does not see a conflict, the Court notes that the Sale Order also provided that in case of any conflict "between the [Sale Agreement], the Sale Procedures Order, and this Order, this Order shall govern." *Id.* at ¶ 3.

36 Main Case ECF #2967 (the *363 Decision* in the form originally docketed) and #2968 (Sale Order). The *363 Decision* had a fairly substantial subsequent history, detailed at n.10 above.

37 *See* Main Case ECF #3106.

Between the time of the filing of its chapter 11 case and the closing on the 363 sale, Old GM repaired and paid for approximately 1,000 VTi claims.[38] For about a month after the closing, New GM also made repairs or paid for VTi transmission problems.[39]

But on August 4, 2009, less than a month after the closing, a PowerPoint presentation at New GM made reference to the "CVT Issue"[40] (a reference to the company's policy concerning the VTi transmissions)—and importantly, indicated that the "*Settlement has been assigned to Old GM*"—rather than New GM. And it listed "Customer Satisfaction/Retention Options,"[41] supporting New GM's position here that its actions in this area show no more than (a) uncertainty as to what its duties then were, or (b) what it should do to promote customer satisfaction—but in either case, as distinct from an admission that its obligations continued.

Internal New GM emails sent during August 2009 reflect uncertainty at the time, and different views, on the part of New GM personnel about whether the payments under the Settlement Agreement were to continue, and should—though their general tenor was that New GM should decide what it wanted to do, as contrasted to recognizing a preexisting duty to act under which New GM was bound.[42] Additionally, an internal email sent in September 2009

---

38 *See* New GM Exh. 6 ("Through May 2009, 45,225 Repairs Completed") and New GM Exh. 8 ("Through June 2009, 46,376 repairs completed"). The Court does not understand New GM (or, for that matter, the Castillo Plaintiffs) to have taken a position on whether Old GM had a legal duty to do so at that time.

39 *See, e.g.*, Joint Exh. Z, claim #220.

40 New GM Exh. 6.

41 *Id.* These options included: "Do Nothing," "Honor the Provisions of the 'Proposed' Class Action Settlement," "Re-write Existing Special Policy to Further Extend the Warranty Time/Mileage," and "Provide Owners With a Voucher (Or Owner Loyalty Certificate) Towards the Purchase of a New GM Vehicle." *Id.* The presentation ultimately recommended a combination of the last two approaches.

42 *See, e.g.*, Joint Exh. AA ("Jamie grabbed me and wants recall spend and warranty spend on CVT. I think you know it will be ugly."); Joint Exh. CC ("Please advise me what our current GM position is on VTI transmission repairs/replacements under the class action settlement. These repairs total thousands of dollars every month just at two of the Atlanta area Saturn stores I contact. Based on the age of the vehicles involved, I would concur with putting these under the 'Old GM' and not covering them, but I am not aware of any changes yet."); Joint Exh. EE ("Now that the settlement will never be put into force, GM legally should not be liable for anything beyond the 5yr/75k. However, Saturn needs to inform their dealers of

indicated that there was a litigation reserve set aside for the CVT settlement, but that the sender understood that all legal settlement reserves were left behind with Old GM.[43]

By September 2, 2009, New GM's Customer Assistance Center "knowledge database" had been updated to indicate that New GM had made the business decision to return to the policy it had followed before the decision to abide by the terms of the Settlement Agreement: customers could be reimbursed up to five years or 75,000 miles, whichever came first.[44] On September 28, a service message titled "Saturn VTi Transmission Settlement Clarification" was sent to all Saturn retailers. Whether wrongly (as the Castillo Plaintiffs contend) or quite properly (as New GM contends), it ended, or should have ended, any and all uncertainty on the part of its recipients. The service message stated that New GM "did not assume liability under the settlement or otherwise for any reimbursement obligations with respect to the VTi transmission,"[45] and that "the responsibility, if any, to provide reimbursement to customers under the settlement remains with [Old GM] subject to the normal procedures of the Bankruptcy Court."[46] The message also confirmed the return to the five year, 75,000 mile policy.[47]

Thereafter, New GM made one final business decision relating to reimbursement for VTi transmission replacement. In early October 2009, internal New GM documents indicate that

---

that."); Joint Exh. EE (citing various scenarios for New GM to choose between as alternatives to the Settlement Agreement reimbursement scheme).

43 *See* New GM Exh. 7.

44 Joint Exh. HH ("Just wanted to let you know that our CAC knowledge database has been updated this week to instruct that we stop following the guidelines of the 'proposed' class action settlement and to start again following the parameters contained in prior Saturn bulletin 0402A which is the Special Policy covering VTi's for 5 years and 75,000 miles.").

45 Joint Exh. QQ.

46 *Id.*

47 The return to the five year, 75,000 mile policy resulted in dissatisfaction on the part of some New GM employees. *See* Joint Exh. GG (email from Jonathan Huish to GM CARS Site Managers). The Court takes this email as an obvious expression of frustration by a New GM employee. But the Court does not see it as any indication that this employee believed—or, more importantly, had any basis for a conclusion—that New GM had a legal obligation to honor the Settlement Agreement.

"Fritz Henderson [the New GM CEO at the time] [was] not happy with reverting to [the 5/75,000 policy] for Saturn CVT owners, and want[ed] to do more."[48] After considering its options, New GM issued Special Policy #09280 on November 5, 2009.[49] The new Special Policy gave customers two options: within eight years, or 100,000 miles (whichever occurred first), Saturn customers could receive either a 50% reimbursement for covered transmission repairs or a $5,000 credit toward the purchase of a new GM vehicle.[50] The Court finds, in this connection, that this was a desire on the part of Mr. Henderson to voluntarily do more for Saturn owners (to protect the brand and aid in achieving customer satisfaction), as compared and contrasted to implementing a view that New GM was legally bound to do it.

*6. Potential Sale to Penske*

The Court also makes findings of fact with respect to the once-contemplated sale of the Saturn brand from New GM to Penske Automotive Group ("**Penske**").[51] (On September 30,

---

48 Joint Exh. SS.

49 Joint Exh. RR.

50 The Castillo Plaintiffs also ask the Court to consider a letter sent by one Paula Maggard to consumers Michael and Pam Rose with respect to the VTi class action, in which she stated, at its conclusion:

> My summation in conversation with Mrs. Rose was that General Motors' Special Policy 09280A dated December, 2009, would have allowed her a 50% reimbursement for repairs, whereas, the proposed class action settlement, once the case proceeds, the Roses would be qualified for a 75% reimbursement for repairs. [*sic*] It would be to the Roses' advantage to participate in the proposed class action lawsuit.

Joint Exh. BBB. Although Ms. Maggard wrote "General Motors Legal Department" under her name, she was in fact, as New GM's Steven Cernak testified, not a member of New GM's Legal Department, and "violated established policies and procedures" by appending that phrase beneath her signature. Cernak Decl. ¶ 4. In fact she was merely a lay customer assistance agent (not a lawyer or paralegal) and an employee of a third party supplier of "lay people who attempt to address issues concerning GM vehicles on a customer satisfaction basis . . . ." *Id.* at ¶ 2. But even if she had been a member of New GM's Legal Department, the Court could not place any reliance on what she said. Apart from her lack of authority to speak as to New GM's legal obligations or what would be to a customer's advantage, she lacked both legal training and knowledge of the relevant facts. This Court is in a much better position to determine what New GM's obligations were than she was.

51 *See* Joint Exh. R. Although the letter from Jill Lajdziak is not dated, the text makes a reference to GM's restructuring process, which indicates to the Court that it was likely written and sent early in the GM bankruptcy.

2009, however, New GM announced that the proposed sale had fallen through, and New GM concurrently announced a decision to wind down the Saturn brand.)

An internal New GM email in September 2009 indicated that "there might be some concern" from Penske with the decision to adopt the five year, 75,000 mile policy.[52] And at argument, counsel for New GM suggested that based on New GM's thinking that "all these people w[ould] be Penske's customers," there was "no reason to continue to try to promote customer satisfaction on a voluntary basis" by continuing to pay claims according to the Settlement Agreement.[53] New GM's counsel also stated in argument that once the Penske sale fell through, New GM had a business reason to change the policy once again, to an option of 50% reimbursement or a voucher to use toward a new GM vehicle—both for Saturns within eight years or 125,000 miles.

The Court finds all of Counsel's arguments premised on the Penske communications—some of which communications cut one way, and some the other—to be unduly speculative and, frankly, very weak—especially since they all relate to events *after* the execution of the Sale Agreement and entry of the Sale Order, and the 363 Sale closing, and reflect no consideration of the discussions before the sale, or New GM's legal obligations at the time. The Court considers communications with respect to the once-contemplated Penske sale to have no meaningful relevance to the issues here.

*7. The Current Controversy*

In August 2009, the Castillo Plaintiffs filed this action—but not in this Court, where this Court had heard the earlier evidence of Old GM's and the Auto Task Force's intent and where the Sale Order (one of the documents to be construed) was entered. They filed instead in the

---

52 Joint Exh. JJ.

53 Tr. of Hrg. on Dec. 14, 2011 at 64.

Delaware Chancery Court, from which New GM removed the action to the Delaware federal district court, and from which, in turn, the action was then transferred to New York and referred to this Court.

On November 18, 2009, the Court ruled on a motion for a preliminary injunction filed by the Castillo Plaintiffs, holding that New GM could not tell customers that the adversary proceeding had been dismissed.[54]

Later, after the Castillo Plaintiffs filed an amended complaint, both parties moved for summary judgment. Though the Court then thought that New GM had the better argument under the documentation and would likely prevail, it found sufficient ambiguity in the documentation to warrant consideration of extrinsic evidence. The extrinsic evidence weighs even more heavily in favor of New GM.

## Discussion

The issue is one of contractual interpretation—*i.e.*, of the Sale Agreement—and, to a lesser extent, of the Court's Sale Order. Though the Court determined, when hearing the cross-motions for summary judgment, that it should not rule based on the language in the documents alone, and would benefit from extrinsic evidence, the Court nevertheless starts, as usual, with textual analysis.[55] It then considers other matters from which it can construe the Sale

---

54 *See* Tr. of Hrg. on Nov. 18, 2009 at 37-43.

55 Preliminarily, however, the Court starts with an observation that is important to keep in mind. In the great bulk of contractual interpretation disputes, the dispute is between the two contracting sides. Here, by contrast, there is no dispute between seller Old GM and buyer New GM, nor between their negotiating predecessors, the former GM and the Auto Task Force. The Castillo Plaintiffs were and are non-parties to the Sale Agreement and the negotiations that led to it, but seek to hold New GM to an alleged contractual intent when the Castillo Plaintiffs were not there.

There is nothing necessarily wrong with that, but the Castillo Plaintiffs must live with the intent of the parties who actually were privy to the negotiations—as that intent was manifested, under fundamental contract law principles, by what the actual parties to the Sale Agreement said to each other, in their contract and negotiations, at and before the time they entered into their agreement. Also under fundamental contract law principles, secret intentions don't count, but intentions stated to one's negotiating counterparty do. *See, e.g.*, 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:1 (4th ed. 2007) ("In the formation of contracts, .

Agreement, including, most importantly, the extrinsic evidence of former GM's and the Auto Task Force's intent. The Court finally considers a somewhat surprising argument advanced by the Castillo Plaintiffs as an asserted aid in the Court's analysis.

*1. Textual Analysis*

The most critical language appears in the Sale Agreement's definition of "Assumed Liabilities." Section 2.3(a)(vii)(A) of the Sale Agreement provided that New GM would assume:

> all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used, or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmission) manufactured or sold by Sellers or Purchaser prior to or after the Closing . . . .

The dispute turns on whether liabilities resulting from a contractually undertaken duty to make transmission repairs on vehicles after their original warranties expired—and to pay the Castillo Plaintiffs' lawyers' fees—are liabilities "arising under":

> express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used, or pre-owned vehicles . . . .[56]

From a textual analysis perspective, the Court continues to believe, as it believed at the summary judgment hearing, that the words "arising under," as used in this context, are not susceptible to "plain meaning" analysis alone. The clause "arising under" may be construed

. . it was long ago settled that secret, subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties."); *Porter v. Comm. Casualty Ins. Co.*, 292 N.Y. 176, 183-184, 54 N.E.2d 353, 356 (N.Y. 1944) (quoting Williston).

[56] Section 2.3(a)(vii)(A) (inapplicable language pruned, including references to parts and equipment, and to the time of manufacture or sale, since the latter covered such both prior to, and after, the Closing).

broadly or narrowly. And either way, it has no meaning of its own. Its coverage can be discerned only by examining the words that follow it.[57]

Thus, unlike some other controversies, the issue here cannot be determined by simply looking to a dictionary definition of a term—here, "arising under"—and deciding how broadly that term should be applied. The Court has no particular problem with the dictionary definition the Castillo Plaintiffs proffer.[58] Nor, so far as the Court can tell, does New GM. But the issue, since the words "arising under" must be followed by something, is "arising under" *what*?[59]

The Castillo Plaintiffs argue that the definition of "arising under," as applied to the relevant facts, means that New GM assumed the Settlement Agreement because the claims underlying the suit the Castillo Plaintiffs brought originated from the express warranty. But New GM disputes that. It counters that the Castillo Plaintiffs' underlying claim did not, in fact, have its origin in the express warranty because the essence of their claim was that the repairs and reimbursements sought by the Castillo Plaintiffs were *outside* the warranty period, and they must have been based on something else. The Court agrees with New GM.

Here the textual analysis strongly favors New GM. The Court cannot conclude that the Castillo Plaintiffs' claims originated from the express warranty. If they had, the Castillo Plaintiffs would have brought a different lawsuit, or none at all. They had to sue *because they no*

---

[57] The words "arising under" appear in the Assumed Liabilities provisions and the words "arising out of" appear in the Retained Liabilities section. Similar considerations apply to both.

[58] They call the Court's attention to the most recent edition of Merriam-Webster's Collegiate Dictionary, in which the relevant definition of arise is "to originate from a source." *Merriam-Webster's Collegiate Dictionary*, "Arise" (11th Ed. 2008).

[59] A recurring theme in the Castillo Plaintiffs' papers is to focus on "arising under," and to argue a broad interpretation of that term, to bring their earlier lawsuit, and settlement, within the "arising under" scope, with little or no attention to the words that came after that clause. Such an inquiry is misguided. The task is not to see how the written words can be stretched to cover something nobody thought about, or thought about differently; it is instead to determine what the parties intended. That is achieved by reference to the words GM and the Auto Task Force used, and, to the extent that is inconclusive, by reference to what they said to each other at the time, a matter discussed above and below.

*longer had* an express warranty; it had earlier expired. They had to find means to recover by an alternative. That doesn't mean that they didn't have a potentially good claim, of course, but it means that by whatever means they might win, it wouldn't be on the basis of an express warranty—which, if they had it, would have already given them what they needed.

Here the matters for which New GM took on liability under the Sale Agreement are stated with great specificity—in several lines of text following the words "arising under." Additionally, while strictly speaking, "Retained Liabilities," the subject of the next relevant section, are Old GM's problem, and not New GM's concern, they shed light on liabilities that former GM and the Auto Task Force determined that New GM would not assume. The Assumed Liabilities are described as the express warranties that customers receive which are "delivered in connection with the sale of new, certified used, or pre-owned vehicles . . . ." They do not, in any commonly understood way, cover litigation obligations (especially for attorneys' fees) that were undertaken because the express warranties had expired.

*2. Caselaw*

Because the issues necessarily turn on the exact contractual language used, caselaw is of limited utility here. But the first of the two somewhat relevant cases supports New GM. The second, while having procedural similarities to the case here, ultimately is not relevant enough.

In the first, *Abraham v. Volkswagen of America*,[60] the Second Circuit reiterated the "general rule . . . that an express warranty does not cover repairs made after the applicable time or mileage periods."[61] It rejected a contention that a "defect discovered outside the time or mileage limits of the applicable written warranty, but latent before that time, may be the basis of

---

60 795 F.2d 238 (2d Cir. 1986) ("***Abraham***").

61 *Id.* at 250.

a valid express warranty claim if the warrantor knew of the defect at the time of the sale,"[62] and expressly disagreed with a district court case, *Alberti v. General Motors*,[63] that had held that the plaintiffs had stated "valid express warranty claims, without regard to when breakdowns had occurred, because General Motors allegedly knew at time of sale that the brake system on the cars in question was flawed and might cause control problems for drivers."[64]

The Second Circuit in *Abraham* rejected the *Alberti* conclusion because "virtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty," and because "[a] rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage."[65] For this reason too, the Court rejects the Castillo Plaintiffs' contention that they had brought express warranty claims in any sense other than the name they attached to them.

In the second, a decision in the *Safety-Kleen* chapter 11 case in the District of Delaware,[66] Judge Walsh considered a situation similar in several respects to the one before this Court. There a company that had purchased one of the debtor's divisions in the chapter 11 case brought an adversary proceeding seeking a declaration that it hadn't assumed Superfund cleanup liabilities with respect to one of the sites it had purchased. There, as here, Judge Walsh was asked to construe the sale agreement. It provided, with respect to liabilities to be assumed by the purchaser:

---

62 *Id.* at 249.

63 600 F.Supp. 1026, 1028 (D.D.C. 1985) ("***Alberti***").

64 *Abraham*, 795 F.2d at 250.

65 *Id.*

66 *Clean Harbors, Inc. v. Arkema, Inc. (In re Safety-Kleen Corp.)*, 380 B.R. 716 (Bankr. D. Del. 2008) (Walsh, J.) ("***Safety-Kleen***").

> liabilities and obligations, whether arising before or after the Closing Date, in connection with . . . the operation of the Business (including *liabilities and obligations arising under Environmental Laws* . . . ).

Paragraph O of the sale order provided additional relevant language:

> The liabilities assumed in . . . the Acquisition Agreement specifically include the liability of [Safety-Kleen] with respect to the Business and the Acquired Assets for liability to a government entity under CERCLA or similar state statutes.

Based upon this language, and extrinsic evidence from the sale hearing, Judge Walsh found that the consent decrees and settlement agreements before him evidenced obligations arising under CERCLA and the Spill Act, and as such, were "'liabilities and obligations . . . arising under Environmental Laws . . . .'"[67] And he ruled that the fact that the liabilities were based *solely* on CERCLA claims meant that they arose under an environmental law, and thus were assumed by Clean Harbors.

Relying on *Safety-Kleen*, the Castillo Plaintiffs argue that "to arise under" should mean "to have its origin or basis in"[68] (a contention with which the Court agrees), but also, and more importantly, that because their underlying class action raised claims alleging that repairs were unjustifiably excluded from the express warranty, the Settlement Agreement had its "origin or basis" in the express warranty. But in that second respect the Court does not agree, and the Court cannot find *Safety-Kleen* to be relevant as to that.

In *Safety-Kleen*, the defendant tried to argue that the relevant liabilities were those relating to the settlement agreement with a third party (not directly with the government), and thus were *contractual*, not statutory environmental, liabilities. There was no debate over the fact

---

67 *Id.* at 736.

68 *See id.* at 724.

that the settlement agreements at issue had their "origin or basis" in environmental laws. Here, of course, there is sharp debate about whether claims could be asserted under express warranties that had expired, and thus that they could be said to have an "origin or basis" in express warranties that, by their terms, did not apply. At most, here, the Court would be faced with an ambiguity to be resolved by extrinsic evidence.

Though the Court has little doubt that it would decide *Safety-Kleen* just as Judge Walsh did, that case dealt with different language following the "arising under" and different contentions. It is not relevant to the contractual interpretation issues here.[69]

*3. Extrinsic Evidence*

The Court could not, and did not, consider extrinsic evidence at the summary judgment phase of the case. Though it believed that the evidence then available weighed in favor of New GM, it thought it should allow the Castillo Plaintiffs to complete discovery in case there might be discoverable evidence that proved that New GM believed it had taken on the Settlement Agreement as part of the sale from Old GM to New GM. In particular, the Court noted six specific types of extrinsic evidence the Castillo Plaintiffs should have the opportunity to

69 The Castillo Plaintiffs also rely on *Vine Street, LLC v. Keeling*, 460 F.Supp.2d 728 (E.D. Tex. 2006) ("***Vine Street***"). In *Vine Street*, the concept of warranties was only cursorily discussed; one line in the sale agreement between the two companies stated that the "Buyer will also assume . . . all liabilities of Seller . . . under any warranty". *Id.* at 741. Importantly, the *Vine Street* court went on to say that the challenging party did not even invoke a theory based on breach of warranty, and that even if it had, the scope of the liability assumed by the sentence involving warranties was too narrow to transfer CERCLA liability. *Vine Street* does not help the Castillo Plaintiffs' case.

The Castillo Plaintiffs also rely on caselaw applying "arising under" in other contexts, such as arbitration and federal court jurisdiction. When the Court considered argument of that character at the summary judgment phase, it invited the Castillo Plaintiffs to find a "document or admission from or on behalf of New GM stating in substance that 'arising under' was intended in 2.3(a)(vii) to incorporate the definition or meaning as those words are used in Article 3 jurisprudence or in arbitration law . . . ." Tr. of Hrg. on May 6, 2010 at 82. The Castillo Plaintiffs found and presented no such evidence, and thus the Court continues to find definitions of "arising under" in those contexts to be too tangential.

discover, should it exist.[70] But the Castillo Plaintiffs uncovered practically nothing of the type of evidence the Court allowed them to investigate, and the extrinsic evidence weighs heavily against them.

The Court here must consider the many conversations between Old GM and the Auto Task force (both before and after the filing of Old GM's chapter 11 petition) that directly or indirectly addressed the *Castillo* case, and the well-publicized intent of the Auto Task Force with respect to New GM's non-assumption of legacy liabilities. The Court also considers the Castillo Plaintiffs' contentions based on actions taken by New GM personnel (or on its behalf) with respect to payment for VTi transmission claims after its formation.[71]

*(a) Pre-petition Extrinsic Evidence*

Lawyers for the former GM and Auto Task Force representatives understood and agreed that the goal was to leave as many liabilities behind with Old GM and to take those only that

---

[70] *See* Tr. of Hrg. on May 6, 2010 at 81-84. Of course, the Court would consider any form of extrinsic evidence that the Castillo Plaintiffs might have uncovered, but noted these categories as a convenient starting place.

[71] With respect to each of those matters, the Court is mindful of holdings that "'parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.'" *Gulf Insurance Co. v. Transatlantic Reinsurance Co.*, 69 A.D.3d 71, 86, 886 N.Y.S.2d 133, 144 (1st Dept. 2009); *accord In re Barney Mac, LLC*, 2006 WL 2864974, at *14 (Bankr. S.D.N.Y. Oct. 3, 2006) (Gonzalez, C.J.) (same). Though each of those cases involved disputes between the two sides to the contracts in question (as contrasted to the situation here, where the two sides to the contract don't differ as to their intent, and an *outsider* to the contract seeks to find an intent that neither of the contractual parties may have had), the Court assumes, *arguendo*, that the principles articulated in *Gulf Insurance* and *Barney Mac* may be true in situations like this one as well.

But though the Castillo Plaintiffs rely upon these cases, they are unhelpful to them. Here the Castillo Plaintiffs were not parties to the agreement they ask this Court to construe; rather the original parties were the original GM and the Auto Task Force, and the successors to each were Old GM and New GM. And as it is the intent of *those entities* (and particularly the former) that is controlling, the Court looks first to their statements at the time, to each other and to the Court, to see "what they meant."

And reliance on action under a contract can be warranted only to the extent that those assertedly acting under the contract had knowledge of the contractual intent. Here, as discussed above and below, the evidence establishes, at best, uncertainty amongst New GM personnel as to whether or not New GM took on responsibilities under the Settlement Agreement, or (as is the case with customer support representative Maggard, see n.50, *supra*) comments by a non-lawyer (or employee) customer support representative who had no basis for knowing what had been intended.

were commercially necessary along to New GM.[72] The *Castillo* Settlement Agreement was a classic example—and specifically identified as such—of an obligation that would be "left behind."

Two highly relevant events particularly evidence the shared intent, as between the former GM and the Auto Task Force, with respect to liabilities like the *Castillo* Settlement Agreement. First, as discussed above,[73] in the phone call on May 14, 2009 between former GM and Cadwalader lawyers (the latter acting for the Auto Task Force), *Castillo* was expressly mentioned as an example of a litigation liability that would be "left behind" with Old GM.

Second, as also discussed above,[74] an additional call, discussing the rejection of settlement liabilities similar to *Castillo* (even though it did not similarly identify *Castillo* by name), likewise confirmed that such settlement agreements would be left behind and not taken over by New GM.

It thus is clear, from as early as prior to former GM's filing for Chapter 11 protection, that the former GM and the Auto Task force shared a common understanding that settlement liabilities—including, as they expressly discussed, the *Castillo* Settlement Agreement—would be left behind and not assumed by New GM.[75]

---

72 *See* Buonomo Dep. at 27 ("Well, the intent and structure of the transaction that was outlined by the [T]reasury team was that all liabilities would be left behind except a few individual items which included the expressed warranties and included contracts necessary to the operation of the business.").

73 *See* page 6, *supra*.

74 *See* page 7, *supra*.

75 Likewise, the underlying understanding between former GM and the Auto Task Force—that the mechanism of the 363 Sale was designed to leave behind as many liabilities as possible—reinforces that conclusion. The Court also notes what will be a recurring theme through the remainder of the evidence: the lack of any statement, document, or other form of evidence indicating that the Settlement Agreement was to be assumed by New GM.

*(b) Extrinsic Evidence From Time Between June 1, 2009 Chapter 11 Case Filing and Closing of the 363 Sale*

Extrinsic evidence from the time between the June 1, 2009 chapter 11 case filing and the July 10, 2009 closing likewise confirms the previously established understanding between the Auto Task Force and former GM. Again, evidence from this period is noteworthy by reason of how little the Castillo Plaintiffs found to support their argument.

On the first day of its chapter 11 case, GM's need to shed legacy liabilities was expressly noted in its counsel's opening remarks to the Court.[76] When the Sale Procedures Order was entered, the Settlement Agreement was never listed as an Assumable Executory Contract under the Sale Agreement, and it was marked for Old GM to "reject later."[77] And when Auto Task Force member Harry Wilson testified, about four weeks later, he once again confirmed the intention that the new purchaser—what would become New GM—take on only those liabilities that would be necessary for the commercial success of New GM.[78]

Additionally, the reaction by former GM and the Auto Task Force to objections by the state AGs (wherein the AGs encouraged New GM to take on more liabilities, including implied warranties) also supports New GM's position. As discussed above,[79] Larry Buonomo, Harry Wilson and others discussed these concerns in a conference call prior to the 363 Sale hearing, at which Buonomo argued that taking on these additional liabilities would mean assuming the entire class action docket, which included the *Castillo* Settlement Agreement. And Wilson

---

76 *See* page 7, *supra*.

77 Main Case ECF #4680 (order granting motion to reject the Settlement Agreement). While a rejection at that time may have been self-serving (since the Court cannot rule out the possibility that Old GM would cooperate with New GM if it did not cost Old GM too much), it was nevertheless a decision by Old GM (which would have to satisfy an additional claim as a result), not New GM—and was a decision consistent with the parties' earlier joint intent. The Court finds the evidence of rejection to be probative but not dispositive.

78 *See* page 8, *supra*.

79 *See* pages 9-10, *supra*.

observed that "I agree with Larry," "correctly discerning," as Buonomo put it, "that I thought it was a bad idea."[80] Significantly also, the AG concerns resulted in one change in the game plan—assumption of liabilities under Lemon Laws—but no others, and the Lemon Laws change was made *expressly*.

The inclusion of the additional Lemon Laws liability confirms that when New GM wanted to broaden its assumption of liabilities, it knew how to do so. Former GM and the Auto Task Force could have inserted language that would have likewise broadened New GM's liability to include the Proposed Settlement—and there is evidence that they considered doing just that—but instead made a conscious decision to leave behind, with Old GM, the *Castillo* Settlement Agreement and other class action liabilities like it.

Finally, the Court considers the language of the Sale Order itself, which it found at the summary judgment hearing to be a species of extrinsic evidence.[81] The relevant language provides:

> The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components prior to the Closing of the 363 Transaction and specifically identified as a "warranty." The Purchaser is not assuming responsibility for Liabilities contended to raise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.

The Court continues to believe, as it said at the hearing on summary judgment, that this language "is fairly strong evidence" in favor of New GM, though not necessarily dispositive.[82]

---

80 *See* n.30.

81 Tr. of Hrg. on May 6, 2010 at 12, 79.

*(c) Extrinsic Evidence From Time Following the Closing*

The Court now turns to the consideration of extrinsic evidence from the time after the 363 Sale closing. It is with respect to this period that the Castillo Plaintiffs make their only real points—noting that after the 363 Sale was completed, New GM continued, for a time, to pay claims even though it would not have been required to do so if the Settlement Agreement had stayed behind with Old GM. But the evidence does not support the finding of contractual intent that the Castillo Plaintiffs would like to assign to it.

Rather, as the Court's factual findings above address, the evidence reflects no more than uncertainty as to whether or not obligations under the Settlement Agreement were assumed; a back and forth as to whether an assumption of these liabilities would be in New GM's interest; and, in one case, a statement by an outside contractor who was not in a position to know.

The evidence establishes inertia after the closing, and a period of a few weeks of uncertainty and delay before New GM personnel focused on their legal rights. But importantly, with all the evidence provided to the Court, including internal New GM emails and presentations, there is *no* indication that New GM believed it had to pay VTi transmission claims because it believed it had assumed the Settlement Agreement under the Sale Agreement, and had a legal obligation to do so.

*4. Policy Argument*

Finally, the Castillo Plaintiffs make an argument that the Court finds to be rather surprising, if not also insulting. They contend that interests in "maximizing the estate" should influence this Court's decision in this adversary proceeding, because if New GM is not obligated to satisfy the Castillo Plaintiffs' obligations, Old GM likely will. Thus, they argue, the Court

---

[82] Tr. of Hrg. on May 6, 2010 at 79.

should construe the Sale Agreement to relieve Old GM of the asserted liability it would otherwise have.

But that argument misunderstands the role of bankruptcy courts in considering the plenary litigation over which they have jurisdiction in adversary proceedings. Of course it is true that when deciding matters in connection with an estate's day-to-day affairs, bankruptcy courts care very much about maximizing the value of the estate (and minimizing drains on estate assets)—but those matters are considered in the context of making discretionary calls. They are not, nor can they be, a factor when bankruptcy courts decide disputed issues of law or fact in the adversary proceedings on their watch.[83] The Court is unwilling to agree that there is or should be a rule of bankruptcy law that the "estate should win," thereby maximizing its assets, or that "tie goes to augmenting the estate, or reducing its liabilities."[84] If the law were otherwise, every fraudulent conveyance, preference, or contract action brought by an estate or its trustee would start with a finger on the scales.

The Court rejects this argument out of hand.

---

83 Similar considerations may also apply even in contested matters, *e.g.*, where a landlord has a claim that, if honored, will come at the expense of all of the debtor's other creditors.

84 The Castillo Plaintiffs cite to one case seemingly articulating such a juridical approach, *In re Easton Tire Co.*, 35 B.R. 494, 495 (Bankr. E.D. Mo. 1983) ("***Easton Tire***"), which did indeed state, in a brief decision, that "although the intention of the parties is to be given considerable weight in interpreting an agreement in a bankruptcy case, the interests of the debtor's creditors must also be considered," and "that an ambiguity in an agreement which affects the bankruptcy estate must be resolved in favor of the best interests of all creditors." The Court respectfully declines to follow *Easton Tire* here. The language quoted from *Eastern Tire* was in the context of deciding a motion for relief from stay (which was and is a discretionary determination) and not an adversary proceeding, and though the *Easton Tire* court didn't flesh out its reasons for its view, *Easton Tire* would at least seemingly be distinguishable in any event. But whether or not *Easton Tire* could be found to be distinguishable, the Court must expressly reject the quoted rationale in proceedings (most obviously adversary proceedings) where the bankruptcy court is sitting as any other court would, determining disputed issues of fact and law.

Conclusion

For the foregoing reasons, judgment will be entered in favor of New GM. Pursuant to Fed.R.Bankr.P. 7058 and Fed.R.Civ.P. 58, New GM is to settle a stand-alone judgment denying the relief sought in the Castillo Plaintiffs' complaint.

Dated: New York, New York
April 17, 2012

***s/ Robert E. Gerber***
United States Bankruptcy Judge